DAVIS, Judge.
 

 *14
 
 In this appeal, we revisit the issue of whether an employee who suffers an illness allegedly resulting from a meeting with her supervisor is able to establish an injury by "accident" under North Carolina's Workers' Compensation Act. Alina Cohen appeals from the opinion and award of the North Carolina Industrial Commission denying her claim for workers' compensation benefits. Because we conclude that she has failed to show an injury by accident within the terms of the statute, we affirm.
 

 *15
 

 Factual and Procedural Background
 

 On 19 January 2010, Cohen was hired by Franklin County Schools ("Defendant") to work as a full-time math teacher at Early College High School ("Early College"). Each teacher at Early College was "required to create an individual PDP [Professional Development Plan] at the beginning of the year that stated their goals and also a plan as to how to accomplish those goals with an associated timeline." As a part of her employment, Cohen "underwent periodic classroom observations and was evaluated by the school principal, James A. Harris, Jr." Harris was Cohen's principal throughout her employment with Early College.
 

 Pursuant to his duties as the school principal, Harris would normally conduct "three observations with an evaluation" for each teacher throughout the course of the year. Prior to October 2013, Harris had conducted observations in Cohen's classroom and held evaluation conferences with her. Cohen was aware of the process for teacher observations and post-observation conferences with Harris. She also knew that post-observation conferences "should be during the ten working days after ... observation."
 

 In 2013, Harris received "various complaints in regard to [Cohen's] teaching." After having received these complaints, Harris "prepared an observation and a 'principal directed' PDP to go over with [Cohen] on October 11, 2013." He believed that the "PDP was designed for [Cohen] and him to work together to assist [her] and to get her to the level where we felt that she would become a better teacher."
 

 On 11 October 2013, Harris went to Defendant's Central Office to meet with Charles Fuller, a director of secondary education. Harris told Fuller that he "had prepared a directed PDP for [Cohen] and that [he] did not believe that [Cohen] would receive it well." Because Harris did not have an assistant principal and "wanted someone to be a witness" during the meeting, Harris asked Fuller to sit in on the meeting.
 

 That same morning, Harris saw Cohen at Early College and told her "that he had to go over the observation and PDP with her that day, and asked her to stay after school." In the past, Harris had not given Cohen advance notice of post-observation conferences and would typically "do most of these at the end of the school day...."
 

 At the conclusion of the school day on 11 October 2013, Cohen was leaving the school building for the weekend when she saw Fuller coming into the building. Cohen and Fuller greeted each other, and she walked outside.
 

 *612
 
 As she was leaving, Harris ran out of the building and stated,
 
 *16
 
 "Mrs. Cohen, I need you to come back." Cohen followed Harris into his office and saw Fuller sitting in a chair inside the office.
 

 Harris proceeded to explain that he was meeting with Cohen because of problems with her teaching. He explained that he had written out a PDP for her. She refused to sign the PDP and asked for a sheet of paper to instead write that she had been "pushed to sign [the PDP] without reading...." The meeting lasted approximately fifteen to twenty minutes, and Cohen continued to argue with Harris until the end of the meeting at which point all three participants left the school.
 

 Cohen testified that at some point during the 11 October 2013 meeting with Harris she began to experience "horrible head pain" and felt as though "her head was going to blow up." On 14 October 2013, she was seen by Dr. Richard Noble, an internist, and later that same day she was examined by Dr. Mitchell Freedman, a neurologist at Duke Health. Both Dr. Noble and Dr. Freeman determined that Cohen had suffered a stroke.
 

 On 15 June 2015, Cohen initiated a workers' compensation claim by filing a Form 18 ("Notice of Accident to Employer"), and she submitted a Form 33 ("Request That Claim Be Assigned For Hearing") on 16 July 2015. Defendant filed a Form 61 ("Denial of Workers' Compensation Claim") on 20 July 2015.
 

 On 12 April 2016, a hearing was held before Deputy Commissioner Philip A. Baddour, III. Cohen testified at the hearing in support of her claim for benefits. Harris and Fuller testified on behalf of Defendant. Depositions were later taken of Dr. Noble and Dr. Freedman.
 

 On 23 December 2016, the deputy commissioner issued an opinion and award determining that Cohen's meeting with Harris and Fuller on 11 October 2013 was "an ordinary incident of employment constituting circumstances common to employees in any profession. There was nothing unexpected or unusual with regard to the way the meeting was arranged or conducted." The deputy commissioner concluded that Cohen "did not experience an unlooked for and untoward event ... [and] did not suffer an injury by accident within the meaning of the North Carolina Workers' Compensation Act, and therefore her claim is not compensable." Cohen appealed to the Full Commission.
 

 On 25 July 2017, the Full Commission issued an Opinion and Award affirming the deputy commissioner's decision and denying Cohen's claim for benefits. On 7 August 2017, Cohen filed a timely notice of appeal.
 

 *17
 

 Analysis
 

 Appellate review of an opinion and award of the Industrial Commission is typically "limited to consideration of whether competent evidence supports the Commission's findings of fact and whether the findings support the Commission's conclusions of law."
 
 Philbeck v. Univ. of Mich.
 
 ,
 
 235 N.C. App. 124
 
 , 127,
 
 761 S.E.2d 668
 
 , 671 (2014) (citation and quotation marks omitted). "The findings of fact made by the Commission are conclusive on appeal if supported by competent evidence even if there is also evidence that would support a contrary finding. The Commission's conclusions of law, however, are reviewed
 
 de novo
 
 ."
 
 Morgan v. Morgan Motor Co. of Albemarle
 
 ,
 
 231 N.C. App. 377
 
 , 380,
 
 752 S.E.2d 677
 
 , 680 (2013) (internal citations omitted),
 
 aff'd per curiam
 
 ,
 
 368 N.C. 69
 
 ,
 
 772 S.E.2d 238
 
 (2015).
 

 Under the Workers' Compensation Act, an injury is compensable if the claimant proves three elements: "(1) that the injury was caused by an accident; (2) that the injury was sustained in the course of the employment; and (3) that the injury arose out of the employment."
 
 Hedges v. Wake Cty. Pub. Sch. Sys.
 
 ,
 
 206 N.C. App. 732
 
 , 734,
 
 699 S.E.2d 124
 
 , 126 (2010) (citation and quotation marks omitted),
 
 disc. review denied
 
 ,
 
 365 N.C. 77
 
 ,
 
 705 S.E.2d 746
 
 (2011).
 

 Here, Defendant concedes that Cohen's injury occurred during the course of her employment with Defendant. However, Defendant contends that Cohen has failed to satisfy the remaining two prongs of the inquiry.
 

 We first determine whether the Commission erred by concluding that her injury was not the result of an accident within the meaning
 
 *613
 
 of the Workers' Compensation Act. It is well established that
 

 [f]or an injury to be compensable, the plaintiff must introduce competent evidence to support the inference that an accident caused the injury in question.... As used in our Workers' Compensation Act, the terms "accident" and "injury" are not synonymous.... An accident, as the term is used in the Act, is (1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause.... There must be some unforeseen or unusual event other than the bodily injury itself.
 

 Cody v. Snider Lumber Co.
 
 ,
 
 328 N.C. 67
 
 , 70,
 
 399 S.E.2d 104
 
 , 106 (1991) (internal citations, quotation marks, and brackets omitted).
 

 *18
 
 The Commission made the following findings of fact in its Opinion and Award relevant to this issue:
 

 5. [Cohen] was hired to work at the Early College High School ("Early College") program with Defendant Franklin County Schools as a full-time math teacher beginning on January 19, 2010.
 

 6. As part of her employment, [Cohen] underwent periodic classroom observations and was evaluated by the school principal, James A. Harris, Jr. Mr. Harris was [Cohen]'s principal through her entire time at the Early College. Mr. Harris testified that in the course of a year, there are normally three observations with an evaluation.
 

 ....
 

 8. There was no requirement to announce when a principal was going to do an observation, but Mr. Harris testified that he usually announced the first observation, and thereafter he would tell the teacher that he was going to be in the room within a week's time, but not specify the exact day.
 

 9. [Cohen] had undergone prior observations with Mr. Harris. [Cohen] testified that one year Mr. Harris refused to have an evaluation conference with her. However, according to the stipulated exhibits and Mr. Harris's testimony, the conference was not held because [Cohen] was on family medical leave due to her husband's illness and was not teaching at that time.
 

 10. By 2013, Mr. Harris had received various complaints in regard to [Cohen]'s teaching. Mr. Harris testified that a complaint had been received that [Cohen] asked a student about what was on a North Carolina final exam, which is given for classes without an end-of-course exam. Mr. Harris further testified that there had been complaints from students that material was on tests that [Cohen] had not covered in class and that graded tests were not returned to students. Mr. Harris suspected, and later confirmed, that [Cohen] was recycling tests. This explained why there were items on the tests that had not been covered in class. Mr. Harris testified that in early 2013 he discussed these complaints with [Cohen] and there were
 
 *19
 
 meetings between [Cohen] and disgruntled parents and students regarding the complaints.
 

 11. [Cohen] testified that prior to October 11, 2013, she had no idea that there were any problems with her teaching. She also stated that there were never any issues about testing or protocols with testing.
 

 12. Mr. Harris explained that as part of the evaluation process, teachers and administrators use different documents and forms for career development. Specifically, Mr. Harris explained that there is the observation and summary of the observation, but that there is also a Professional Development Plan (PDP). Mr. Harris testified that there were various types of PDPs. He explained that all of the teachers at his school were required to create an individual PDP at the beginning of the year that stated their goals and also a plan as to how to accomplish those goals with an associated timeline.
 

 13. Mr. Harris prepared an observation and a "principal directed" PDP to go over with [Cohen] on October 11, 2013. Mr. Harris testified that based on the information that he had received from students and parents, and some of his observations, he prepared a "principal directed" PDP for [Cohen] to specifically address these issues
 
 *614
 
 and concerns and detail areas for improvement. The directed plan was for a 90-day timeframe. Mr. Harris testified that during the 90-day period, the PDP was designed for [Cohen] and him to work together to assist [Cohen] and "to get her to the level where we felt that she would become a better teacher."
 

 14. On Friday, October 11, 2013, Mr. Harris went to the Franklin County Schools' Central Office to meet with Charles Fuller, director of secondary education overseeing curriculum instruction for grades 6 through 12. Mr. Fuller and Mr. Harris testified that Mr. Harris had prepared a directed PDP for [Cohen] and that Mr. Harris did not believe that [Cohen] would receive it well. Mr. Harris testified about his conversation with Mr. Fuller, "I told him that the documents that I was going to present may not be very flattering for Mrs. Cohen and that she may object and I wanted someone to be a witness because I
 
 *20
 
 do not have an assistant principal that could come in with me. So I wanted a neutral party to be-to be present during that time."
 

 15. Mr. Harris testified that he saw [Cohen] earlier in the day on October 11, 2013 and told her that he had to go over the observation and PDP with her that day, and asked her to stay after school.
 

 16. Mr. Harris explained that the teachers know that he has ten days to get back with them after an observation is done, and sometimes the teacher comes to him to initiate a discussion. [Cohen] had full knowledge of this procedure, as she testified: "So after this evaluation, principal-okay-come in observe-observation, let's say. Okay. After observation, principal set up with teacher post-observation conference. Post-observation conference with the rules of the North Carolina State should be during the ten working days after it was actually observation [sic]."
 

 17. Mr. Harris explained that he had not previously scheduled post-observation conferences with [Cohen] in advance. Mr. Harris testified, "I don't believe I did because, again, sometimes you just maybe grab a person and say, 'Hey, I need to get this done'.... So I try to do most of these at the end of the school day because our school is unique. There is always a time when they're supervising students, so to do that during a planning time is not a good time because they are with people. So the best time to do it is usually after-after school."
 

 18. [Cohen] alleges that at the end of the school day, she cleaned up her classroom and then she saw Mr. Harris as she was leaving and said, "Mr. Harris, I am last one. I leaving [sic] right now. Have a nice weekend." She testified that Mr. Harris told her to have a nice weekend and a rest. She testified that as she left the building, she saw Mr. Fuller coming in and they greeted each other. She then proceeded to the location where her husband picks her up, and that Mr. Harris ran out of the building and said, "Mrs. Cohen, I need you to come back." [Cohen] testified that she thought there was some emergency, "fire or flood or something like this." [Cohen] then went to Mr. Harris'
 

 *21
 
 office where she "heard that he played with the lock," and she noticed Mr. Fuller sitting in a chair to the left a bit behind her. She testified that they did not ask her to sit down.
 

 19. [Cohen] testified that she "felt something not comfortable because school was absolutely empty, building was absolutely empty." She further testified, "I believe the door was locked, but again, I say I believe because after-Okay." These statements are in direct conflict with Mr. Harris' testimony. Mr. Harris testified that the door was never locked, and that the door was closed because the matter was private and he did not want the secretary to hear. Mr. Harris testified that the PDP process is confidential.
 

 20. [Cohen] testified that Mr. Harris started the meeting by saying, " 'Mrs. Cohen, we have a lot of problems,' or trouble-I don't sure [sic] of what word he exactly use-'with your teaching.' " [Cohen] then testified to a narrative that she did not understand the purpose of the meeting, that Mr. Fuller and Mr. Harris began talking about "papers," that they told her it was her PDP, but that she did not have her glasses. [Cohen] further testified,
 
 *615
 
 "I did not have glasses. I cannot see what it's in the writing, but by the form-format, I see it's not my PDP. I say, 'It's not my PDP.' They say, 'Whatever. We prepared this-to this, and you need to sign.' "
 

 21. [Cohen] then testified, "I turned this paper, the PDP. Okay. I could not read but I-see, I know. I thirty-five years teaching. So I look. It was marked toward one-Just a second. Sorry. It was marked toward one position. It's lined up, first, individual plan; second, mentoring plan; and third one is directory-direct-directory and directive plan. This is final step before you fire somebody." [Cohen] contends that she informed Mr. Harris that she did not have her glasses and that she would not sign the PDP.
 

 22. [Cohen] testified about her perception of the events, "I asked few [sic] times, 'What is going on?' but I did not have any answers on this. I was very confused and I become very nervous because, you know, you're in the-I
 

 *22
 
 believe in the locked room with two men. What they said what it's-for me, doesn't make sense. You know, I-okay-I don't want to say it doesn't make sense. I could not understand what is going on. You understand? I don't know how to react. I don't understand things."
 

 23. [Cohen] testified that during the meeting she started to feel bad and started to shake. [Cohen] testified that she started to feel like her head was going to "blow up." According to [Cohen], she informed Mr. Harris and Mr. Fuller multiple times during the meeting that she was feeling bad and needed to see a doctor because she had high blood pressure. [Cohen] testified that Mr. Harris and Mr. Fuller pressured her to sign the PDP and informed her that once she signed the PDP then she could leave.
 

 24. By contrast, Mr. Harris testified that [Cohen] sat down, and he began to explain to her why they were there and about the PDP and the observation. Mr. Fuller testified that Mr. Harris asked "Could we review this?" and [Cohen] said, "Sure," and she took a seat. Mr. Harris explained that he wanted to go over the PDP first so that she would understand what he was expecting of her with the milestones he had set, and that he was then going to go over the observation. He asked her if she would acknowledge receiving the documents, and he explained to her that "signing those documents did not imply that she agreed or accepted, just that she had received and that she understood what I was explaining to her." Mr. Harris testified, "And when I started, it-she interrupted, and every time from that point on, I would start to explain to her, she would interrupt. It got to the point where at one point Mr. Fuller said, 'Mrs. Cohen, if you would just stop and allow him, he will explain to you everything that's involved,' and then when I proceeded again, she would interrupt again."
 

 25. Mr. Harris testified that this process lasted about fifteen to twenty minutes. At that point, [Cohen] asked for a piece of paper and sat at the corner of Mr. Harris' desk and wrote out a statement. [Cohen] got up to make a copy of the document but came back stating that the copier would not work, and Mr. Harris went to help her make copies. By this time, the secretary was gone and
 
 *23
 
 they left the door open. Mr. Harris testified that [Cohen] continued to "argue and whatnot" until close to 4:00 p.m. and then departed.
 

 26. Mr. Harris testified that [Cohen] did not complain of dizziness during the October 11, 2013 meeting and she did not ask to see a doctor. According to Mr. Harris, [Cohen]'s behavior and demeanor as she was leaving the meeting was normal and there was no indication that she needed to seek medical assistance at that time.
 

 ....
 

 28. The Full Commission finds that [Cohen] perceived the PDP and observation documents to be, as she testified, the "final step before you fire somebody." However, as Mr. Fuller and Mr. Harris testified, a directed PDP is only one step in the evaluation process and does not result in termination of employment; rather, often times performance issues are satisfactorily addressed and the employee remains employed.
 

 *616
 
 29. The Full Commission finds Mr. Harris' testimony as to [Cohen] being informed of the meeting on October 11, 2013, to be credible. [Cohen] demonstrated that she was familiar with the observation process and the purpose of a PDP. The Full Commission finds that [Cohen]'s testimony that she was unaware of a meeting after school to discuss the observation and that she was unaware of the purpose of the meeting is not credible.
 

 30. To the extent the testimony of [Cohen], and Mr. Harris, and Mr. Fuller are inconsistent with regard to what occurred at the meeting in Mr. Harris' office, the Full Commission affords greater weight to the testimony of Mr. Harris and Mr. Fuller than to the testimony of [Cohen].
 

 Based on these findings of fact, the Commission concluded that Cohen had not "suffer[ed] an injury by accident within the meaning of the North Carolina Workers' Compensation Act." Cohen has not specifically challenged any of the Commission's findings of fact. Thus, they are binding on appeal.
 
 See
 

 Allred v. Exceptional Landscapes, Inc.
 
 ,
 
 227 N.C. App. 229
 
 , 232,
 
 743 S.E.2d 48
 
 , 51 (2013) ("Unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." (citation omitted) ).
 

 *24
 
 This Court has held that "[i]f an employee is injured while carrying on the employee's usual tasks in the usual way the injury does not arise by accident."
 
 Gray v. RDU Airport Auth.
 
 ,
 
 203 N.C. App. 521
 
 , 525,
 
 692 S.E.2d 170
 
 , 174 (2010) (citation, quotation marks, and brackets omitted). "In contrast, when an interruption of the employee's normal work routine occurs, introducing unusual conditions likely to result in unexpected consequences, an accidental cause will be inferred."
 

 Id.
 

 (citation and quotation marks omitted). Thus, "[t]he essence of an accident is its unusualness and unexpectedness...."
 

 Id.
 

 (citation and quotation marks omitted).
 

 On several prior occasions, this Court has addressed the question of whether an injury sustained by an employee related to a meeting with her supervisor should be deemed to have resulted from an accident for purposes of the Workers' Compensation Act. In
 
 Pitillo v. North Carolina Department of Environmental Health & Natural Resources
 
 ,
 
 151 N.C. App. 641
 
 ,
 
 566 S.E.2d 807
 
 (2002), the plaintiff was a waste management specialist responsible for inspecting commercial hazardous waste facilities. As a part of her employment, she was subjected to annual performance reviews from her supervisor.
 
 Id.
 
 at 643,
 
 566 S.E.2d at 809
 
 . During one such review, she "received ratings of 'outstanding' or 'very good' in twelve areas, and a rating of 'good' in two areas, for an overall rating of 'very good plus.' "
 

 Id.
 

 The plaintiff was upset that her co-workers had rated her as merely "good" in two areas. She sought to meet with the deputy director and personnel officer of the division.
 
 Id.
 
 at 643,
 
 566 S.E.2d at 810
 
 . The meeting lasted two hours and was attended by the deputy director, the personnel officer, the plaintiff's supervisor, and the manager of employee relations. The following day, the plaintiff was referred to a psychiatrist and was treated for "stress induced anxiety" and a "diagnosed nervous breakdown."
 

 Id.
 

 The plaintiff filed a claim for workers' compensation benefits, but the Commission denied her claim.
 
 Id.
 
 at 644,
 
 566 S.E.2d at 810
 
 . We affirmed, holding that the plaintiff did not suffer an injury by accident.
 
 Id.
 
 at 646,
 
 566 S.E.2d at 812
 
 . In so ruling, we rejected her argument that the presence of her supervisor and the manager of employee relations as well as the subject matter of the meeting and the behavior directed toward her were "unexpected and traumatic."
 
 Id.
 
 at 646,
 
 566 S.E.2d at 811
 
 .
 

 In
 
 Knight v. Abbott Laboratories
 
 ,
 
 160 N.C. App. 542
 
 ,
 
 586 S.E.2d 544
 
 (2003), the plaintiff, a laboratory employee, had requested a vacation day but her request was denied by her supervisor, Mr. Fuller. She
 
 *25
 
 subsequently learned that her co-worker had received the same vacation day that she had requested. Upon becoming aware of this information, she went to Mr. Fuller's office.
 

 Id.
 

 at 544
 
 ,
 
 586 S.E.2d at 545
 
 . Mr. Fuller became upset when the plaintiff asked him about the denial of her vacation request. He "rose from his desk, and began talking to plaintiff in a loud, angry voice waving his hands and fingers in plaintiff's
 
 *617
 
 face."
 

 Id.
 

 During the meeting, "both parties raised their voices," and the plaintiff "returned to her workstation in tears."
 

 Id.
 

 After the meeting, the plaintiff broke out in hives and sought medical attention.
 

 Id.
 

 She was diagnosed with Post Traumatic Stress Disorder and recurrent major depression, which her psychologist believed was substantially aggravated by the confrontation.
 

 Id.
 

 at 544
 
 ,
 
 586 S.E.2d at 546
 
 . She filed for workers' compensation benefits, but the Commission found that her injury had not occurred by accident and was therefore non-compensable.
 

 Id.
 

 at 545
 
 ,
 
 586 S.E.2d at 546
 
 . Citing
 
 Pitillo
 
 , this Court affirmed the denial of her claim for benefits.
 

 In this case, although plaintiff initiated the meeting with Fuller, she contends his behavior toward her was unexpected and traumatic. The Commission found, however, and the evidence shows that both plaintiff and Fuller raised their voices and both were participants in the argument initiated by plaintiff's complaint that she had improperly been deprived of her desired vacation day. The Commission also recognized that while such confrontations may be infrequent, disagreements between an employee and a supervisor are not uncommon and found that the confrontation between plaintiff and Fuller did not constitute an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. We agree with the Commission's findings. The evidence shows that plaintiff deliberately initiated the meeting with Fuller to voice her disagreement with his decision to award the vacation day to another employee. It is not unexpected that this would lead to a heated discussion involving raised voices on both the part of the supervisor and employee.... Therefore, the heated confrontation with plaintiff's supervisor was not so unusual such as to constitute an interruption in the normal work routine.
 

 Id.
 

 at 546-47
 
 ,
 
 586 S.E.2d at 547
 
 (internal citations and quotation marks omitted).
 

 *26
 
 In the present case, Cohen contends that the 11 October 2013 meeting itself was unusual and resulted in unexpected consequences because (1) Fuller was sitting in on the meeting; (2) a "principal directed" PDP was utilized; and (3) Cohen left the meeting without signing the PDP. However, Cohen's attempt to shoehorn the facts of this case into the definition of the term "accident" for purposes of a workers' compensation claim is unavailing. We see no material distinction between the meeting at issue here and the meetings at issue in
 
 Pitillo
 
 and
 
 Knight
 
 . Although the meeting in the present case was not initiated by Cohen, we do not read
 
 Pitillo
 
 or
 
 Knight
 
 as standing for the proposition that this factor alone is dispositive in determining whether a meeting is sufficiently unusual or likely to yield unexpected consequences so as to qualify as an accident under the Workers' Compensation Act.
 

 We observe that Cohen had previously participated in post-observation evaluation meetings with Harris. She also knew that other teachers had similarly participated in such meetings-generally within ten days of an observation.
 
 [1]
 

 Moreover, Cohen was familiar with the protocol for PDPs. She had created a PDP for herself on past occasions as all teachers at Early College were required to do. Although she had not previously been required to create a principal directed PDP, Harris had utilized directed PDPs for other teachers at Early College. Thus, this type of principal directed PDP was not a meaningful departure from the typical procedures at the school.
 

 We further note that with respect to the manner in which the meeting was conducted, the Commission's findings establish that the conversation between Cohen and Harris was neither unexpected nor inappropriate. There was nothing remarkable about Harris providing negative feedback to Cohen after having observed her class or requiring her to take action to correct deficiencies in her job performance. Moreover, the Commission rejected the suggestion that either Harris or Fuller raised their voices at Cohen during the
 
 *618
 
 meeting or spoke to her in an inappropriate manner. At most, Cohen received critical feedback that was unwelcome to her-an occurrence that is not unusual for an employee at any job.
 

 While we do not categorically foreclose the possibility that the existence of unusual circumstances could cause a meeting between an employee and her supervisor to constitute an accident under the
 
 *27
 
 Workers' Compensation Act, we are satisfied that the meeting between Cohen and Harris does not present such a case. Thus, we hold the Commission properly determined that Cohen did not suffer an injury by accident.
 
 [2]
 

 Conclusion
 

 For the reasons stated above, we affirm the Full Commission's 25 July 2017 opinion and award.
 

 AFFIRMED.
 

 Judges STROUD and ARROWOOD concur.
 

 [1]
 

 While the record is not entirely clear on this point, it appears that Harris had conducted an observation of Cohen within ten days prior to the 11 October 2013 post-observation meeting.
 

 [2]
 

 Having determined that Cohen has not established that she suffered an injury by accident, we need not address her remaining argument.