Cherry v. Mauck, 2025 NCBC 74.

STATE OF NORTH CAROLINA

LENOIR COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CVS000635-530

JULIUS P. "JAY" CHERRY, JR. and
ANN B. CHERRY,

        Plaintiffs,

v.

ARMISTEAD B. MAUCK,

        Defendant,

v.

AJAL INVESTMENTS, LLC and C-
GAS, LLC,

        Nominal
        Defendants.

**ORDER AND OPINION
ON MOTIONS FOR
SUMMARY JUDGMENT**

1.  This case arises out of a management dispute in two family businesses called AJAL Investments, LLC and C-Gas, LLC. Julius "Jay" Cherry, Jr., and his wife, Ann, accuse their brother-in-law, Armistead Mauck, of breaching the companies' operating agreements by making unauthorized cash distributions. By counterclaim and crossclaim, Armistead seeks to dissolve the companies. Both sides have moved for affirmative summary judgment on their own claims. For the following reasons, the Court **GRANTS** in part and **DENIES** in part both motions.

*Womble Bond Dickinson (US) LLP, by Pressly M. Millen and Samuel B. Hartzell, for Plaintiffs Julius P. "Jay" Cherry, Jr., and Ann B. Cherry.*

*Williams Mullen, by Walter L. Tippett, Jr., and Lewis H. Hallowell, for Defendant Armistead B. Mauck.*

*No counsel appeared for Nominal Defendants AJAL Investments, LLC and C-Gas, LLC.*

Conrad, Judge.

## I.
## BACKGROUND

2. The Court does not make findings of fact when deciding motions for summary judgment. The purpose of this background is to give context for the Court's analysis and ruling.

3. AJAL and C-Gas are closely held, family businesses. C-Gas has just two members: Jay and Armistead. Each holds an equal fifty-percent interest. AJAL has four members: Ann, Jay, Armistead, and Louise (Armistead's wife). As with C-Gas, AJAL's membership interest is split equally between the family's two branches. The Cherrys own half, and the Maucks own half. Jay and Armistead are AJAL's and C-Gas's only managers. (*See, e.g.*, A. Mauck Aff. ¶¶ 4–9, ECF No. 14.)

4. Each company has an operating agreement that details the rights and duties of its members and managers. AJAL's operating agreement gives the managers (Jay and Armistead) "full and complete authority, power and discretion to manage and control" its business. But the members retain control over major organizational matters. Amendment of the operating agreement, for example, requires unanimous written consent of the members, as does voluntary dissolution. In addition, distributions are to be made "at such times and in such amounts as the Majority in Interest of the Members determines, in its sole discretion." (AJAL Op. Agrmt. §§ 3.1, 9.3, 11.2, 12.4, ECF No. 3.)

5. C-Gas's operating agreement similarly gives each member-manager (again, Jay and Armistead) the authority to make "all decisions affecting the business of the

Company" while making clear that neither may unilaterally make major structural changes to the organization. Likewise, distributions are to be made "at such times and in such amounts as determined by the Members." One notable difference from AJAL's operating agreement is that C-Gas's operating agreement includes a deadlock provision. If the members cannot agree on certain matters requiring unanimous or majority approval, "then and in that event, any Member or Members may elect(s) to sell or purchase all other Company Interests" as a means to break the deadlock. If neither member invokes the buyout option "within ten . . . days from the event causing the Deadlock, the Company shall be dissolved." (C-Gas Op. Agrmt. §§ 8.1, 9.1, 9.3, 12.1, 13.2, ECF No. 3.)

6. In addition to AJAL and C-Gas, the Cherrys and the Maucks jointly own a third family business called Cherry Oil Company, Inc., which is in the fuel and propane industry. All three businesses are tightly connected. AJAL's main purpose is to own real estate, including fifteen gas station properties, and lease that real estate to Cherry Oil. C-Gas's assets consist of propane-related equipment and customer lists, which it also leases to Cherry Oil. All or nearly all of AJAL's and C-Gas's revenue comes from Cherry Oil's rent payments. (*See* A. Mauck Aff. ¶¶ 11–13; J. Cherry Aff. ¶¶ 4–7, 9, ECF No. 57.)

7. It seems that the Cherrys and the Maucks ran their businesses peacefully— and profitably—for many years. As far back as 2013, they agreed that AJAL and C-Gas would make monthly distributions of $29,000 and $6,000 to be split equally

between the two families.  This arrangement lasted more than a decade.  (*See* A. Mauck Aff. ¶¶ 19–21.)

8.  Over time, though, the once cooperative relationship between the Cherrys and the Maucks became contentious.  Cherry Oil was the first domino to fall.  In 2021, the Maucks sued "over control, profit-sharing, and the future of" Cherry Oil.  *Mauck v. Cherry Oil Co.*, 2025 N.C. LEXIS 861, at *2 (N.C. Oct. 17, 2025).  It was to be a lengthy, bruising lawsuit.

9.  Perhaps inevitably, the quarrel involving Cherry Oil spilled over to AJAL and C-Gas.  In the Cherrys' words, "various inter-company issues between [Cherry Oil], AJAL, and C-Gas remained in a state of limbo" as the lawsuit dragged on.  By June 2024, the Cherrys were urging action on two of these issues: first, reimbursement of expenses that Cherry Oil had supposedly shouldered for AJAL's benefit; and second, completion of maintenance and improvements that AJAL had deferred during the litigation.  The Cherrys called a special meeting of AJAL's members to put these matters to a vote, but the Maucks did not attend, and there was no quorum to conduct business.  (V. Am. Compl. ¶ 18, ECF No. 9; Compl. Ex. C, ECF No. 3; A. Mauck Aff. ¶¶ 24, 25.)

10.  The abortive meeting kicked off a new round of hostilities.  The Cherrys sent a pointed letter to the Maucks, stating that their absence at the meeting "call[ed] into question the ability of AJAL to conduct its business."  In the same letter, the Cherrys withdrew their "consent to make the continuing monthly" distributions that AJAL

had made since 2013. Armistead, as one of AJAL's managers, made the July 2024 distribution to the members anyway. (Compl. Ex. D, ECF No. 3; A. Mauck Aff. ¶ 26.)

11. At that point, the Cherrys doubled down, giving the Maucks "specific instructions . . . that no cash distributions from" either AJAL or C-Gas were to be made to any member. Over the Cherrys' objection, Armistead made monthly distributions from both companies in August, September, and October 2024. He explained his view that "[w]e agreed to the current monthly distributions," "[w]e have not agreed to stop them," and "you do not have 'the unilateral authority' to do so." In protest, the Cherrys voided their checks and informed Armistead that Cherry Oil would withhold "inter-company rent payments to C-Gas and AJAL in the amounts of the wrongfully retained funds paid by Mauck to himself." (Compl. Exs. E–G, ECF No. 3; Aff. A. Mauck ¶¶ 35–37; Aff. A. Mauck Ex. G.)

12. The Cherrys then filed this lawsuit. They assert one claim for breach of AJAL's operating agreement and another for breach of C-Gas's operating agreement. Both claims rest on allegations that Armistead exceeded his authority when he made distributions without the approval of a majority of the companies' members. (*See* V. Am. Compl. ¶¶ 35–37, 41–43.)

13. Soon after filing suit, the Cherrys moved for a preliminary injunction to bar Armistead from making additional distributions. Following the hearing on this motion but before the Court's ruling, the Cherrys and the Maucks held member meetings for both AJAL and C-Gas. At these meetings, they agreed that Cherry Oil would remit overdue rent to AJAL and C-Gas, but they failed to agree on several

other issues, including whether to make distributions and whether to dissolve the companies. (*See, e.g.*, 2d A. Mauck Aff. ¶¶ 9–12, ECF No. 54.2.)

14. Because the parties continued to dispute Armistead's right to make distributions over the Cherrys' objections, the motion for preliminary injunction remained live. The Court went on to grant the motion, reasoning as follows:

> Both [operating] agreements give the LLCs' members the right to decide when and whether to distribute company cash, and absent approval of a majority of the members, the managers have no authority to make distributions. The undisputed evidence shows that Armistead distributed cash from both LLCs without majority approval and that he intends to do so going forward, thus establishing a likelihood of success on the claims for breach of the operating agreements.

*Cherry v. Mauck*, 2024 NCBC LEXIS 160, at *4 (N.C. Super. Ct. Dec. 18, 2024). On that basis, the Court enjoined Armistead "from making cash distributions from AJAL and C-Gas without the consent of a majority of the companies' members as to the timing and amounts of such distributions." *Id.* at *7.

15. Armistead responded with a counterclaim and crossclaims. In his first crossclaim, he seeks to dissolve AJAL under subsections (i) and (ii) of N.C.G.S. § 57D-6-02(2), alleging that "[i]t is not practicable to conduct AJAL business" and that "[l]iquidation of AJAL is necessary to protect" his rights. Next, he asserts a combined counterclaim and crossclaim for declaratory judgment, seeking a declaration that C-Gas has been dissolved under its operating agreement's deadlock provision. As an alternative to the declaratory-judgment claim, he asserts a crossclaim for dissolution of C-Gas under subsections (i) and (ii) of section 57D-6-02(2), again alleging that "[i]t is not practicable to conduct C-Gas business" and that "[l]iquidation of C-Gas is

necessary to protect" his rights. (Def.'s Crosscl. & Countercl. ¶¶ 46–49, 59, 62, 70–73, ECF No. 36.)

16. Discovery is now closed. Both sides have moved for partial summary judgment. The Cherrys' motion concerns their claims for breach of contract; Armistead's motion concerns his claims for judicial dissolution and declaratory judgment. The Court held a hearing on 12 August 2025. (*See* ECF Nos. 41, 54.)

17. Two events of note occurred after the hearing. First, the North Carolina Supreme Court issued a decision in the dispute over Cherry Oil that effectively brought that litigation to an end. Among other things, the Supreme Court affirmed the dismissal of Armistead and Louise's claim for judicial dissolution of Cherry Oil because they had an alternative remedy available—namely, a "contractual buyout under [a] Shareholder Agreement." *Mauck*, 2025 N.C. LEXIS 861, at *18. The buyout provision gave the two families a way to "resolve[] an intra-shareholder dispute through a mechanism the parties themselves created," as opposed to the "broader and blunter" remedy of judicial dissolution. *Id.*

18. Second, in the wake of the Supreme Court's decision, the Cherrys withdrew their opposition to the crossclaims for dissolution of AJAL and C-Gas under subsection (ii) of section 57D-6-02(2). In doing so, the Cherrys urged the Court not to proceed with dissolution but instead to allow them to buy the Maucks' interests under section 57D-6-03(d). The Court invited the parties to state their positions regarding the effect of the Cherrys' filing on the pending motions. Each side timely filed a

statement in mid-November 2025.  (*See* Notice of Withdrawal, ECF No. 60 ["Cherrys' Notice"]; Pls.' Report, ECF No. 62; Def.'s Report, ECF No. 63.)

19.  The motions are ripe.

## II.
## ANALYSIS

20.  By rule, summary judgment is proper when the record "show[s] that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. R. Civ. P. 56(c).  The Court must view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor.  *See Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 556 (2020); *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011).

21.  When, as here, the party with the burden of proof is the one seeking summary judgment, more is required.  The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury."  *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *see also Kidd v. Early*, 289 N.C. 343, 370 (1976).

22.  If the circumstances warrant, the Court may enter summary judgment "against the moving party."  N.C. R. Civ. P. 56(c).  "Summary judgment in favor of the non-movant is appropriate when the evidence presented demonstrates that no material issues of fact are in dispute, and the non-movant is entitled to entry of judgment as a matter of law."  *A-S-P Assocs. v. Raleigh*, 298 N.C. 207, 212 (1979).

## A. The Cherrys' Motion

23. The Cherrys contend that they are entitled to summary judgment on their claims for breach of contract. The only contested issue is a narrow dispute about the available remedies for the claimed breach.

24. Indeed, at the hearing, Armistead's counsel conceded the issue of liability. It is undisputed that Armistead made distributions from AJAL's and C-Gas's accounts over the Cherrys' objections. His only defense is that the Cherrys' objections were ineffective under the companies' operating agreements. But the Court rejected that argument in an earlier order and held that the operating agreements unambiguously permitted the Cherrys to withhold their consent. *See Cherry*, 2024 NCBC LEXIS 160, at *5 ("Moreover, no provision in either operating agreement requires the members to determine the amount and timing of distributions at formal meetings or by written consent."). Although Armistead stands by his interpretation, he has not asked the Court to reconsider its decision and wishes only to preserve his argument for appeal. Accordingly, there is no genuine issue of material fact, and Armistead is liable for breach of the operating agreements as a matter of law.

25. As for remedies, Armistead's counsel agreed that it would be appropriate to convert the existing preliminary injunction into a permanent injunction. And he agreed that the Cherrys are entitled to nominal damages. *See Bowen v. Fidelity Bank*, 209 N.C. 140, 144 (1936) ("In a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least.").

26. The remaining issue is whether Armistead must pay back the amount of the distributions, plus prejudgment interest, to AJAL and C-Gas. The Cherrys seek an order requiring him to do so, which Armistead opposes.

27. In their opening brief, the Cherrys appeared to treat the repayment of distributions as a form of compensatory damages owed to AJAL and C-Gas. Their demand for prejudgment interest strongly suggested as much. *See* N.C.G.S. § 24-5 (allowing prejudgment interest for compensatory damages); *see also Med. Mut. Ins. v. Mauldin*, 157 N.C. App. 136, 139 (2003) (noting that prejudgment interest is not available for "equitable remedies which require the payment of money"). Had the Cherrys asserted derivative claims, they might have been able to obtain a money judgment for the companies. *See Outen v. Mical*, 118 N.C. App. 263, 266 (1995) ("[I]n a derivative action, the recovery goes to the corporation."). But the Cherrys' claims are direct, not derivative. And they concede that they have not personally suffered any financial harm due to Armistead's wrongful distributions. Thus, the Cherrys may not recover compensatory damages on behalf of AJAL and C-Gas, and they have not sought compensatory damages of their own.

28. In their reply brief and at the hearing, the Cherrys reframed their argument and asserted that they were entitled to specific performance. At no point, though, does the amended complaint plead specific performance as a claim for relief or as a remedy in the prayer for relief. Having failed to give notice of a claim for specific performance, the Cherrys are not entitled to that relief. *See El-Hatto v. El-Hatto*, 2022-NCCOA-691, at *18 (N.C. Ct. App. Oct. 18, 2022) (unpublished) ("We note

Plaintiffs' complaint failed to plead specific performance of the Agreement, declaratory relief, or breach of the written Agreement."); *Benjamin v. City of Durham*, 2014 N.C. App. LEXIS 399, at *1 (N.C. Ct. App. Apr. 15, 2014) (unpublished) (affirming order granting motion to dismiss when "plaintiff fail[ed] to plead each element of a claim for specific performance"); *Wijewickrama v. Christian*, 2023 NCBC LEXIS 98, at *17–18 (N.C. Super. Ct. Aug. 11, 2023) (noting that a plaintiff must plead the existence of a contract and a request to require the opposing party to specifically perform its terms); *see also Cole v. Bonaparte's Retreat Prop. Owners' Ass'n*, 259 N.C. App. 27, 40–41 (2018) (discussing circumstances in which it is improper to award relief not suggested by or embraced within the pleadings).

29.    Accordingly, the Court grants the Cherrys' motion for summary judgment in part.  The Cherrys are entitled to nominal damages and a permanent injunction barring Armistead from making additional cash distributions from AJAL's and C-Gas's accounts without the consent of a majority of the companies' members.  However, the Cherrys are not entitled to an order requiring Armistead to pay the amount of past distributions plus prejudgment interest to AJAL and C-Gas, either as damages or specific performance.

## B.  Armistead's Motion

30.    Armistead contends that he is entitled to summary judgment on his counterclaim and crossclaims.  He seeks judicial dissolution of AJAL under section 57D-6-02(2).  Separately, he seeks a declaration that C-Gas is dissolved under the deadlock provision in its operating agreement.  If C-Gas's deadlock provision does not

apply, then Armistead contends that the company should be dissolved under section 57D-6-02(2).

31. After the summary-judgment hearing, the Cherrys filed a notice withdrawing their opposition to Armistead's claims for judicial dissolution. In the same notice, the Cherrys stated their intent "to elect pursuant to [section] 57D-6-03(d) to purchase [Armistead's] ownership interests in AJAL and C-Gas at the fair value of those interests . . . ." (Cherrys' Notice ¶ 9.) To clarify the Cherrys' position and the effect of their notice on the pending motions, the Court invited both sides to state their views in supplemental filings.

32. In their supplemental filings, the parties expressed divergent views about the effect of the Cherrys' notice on Armistead's crossclaims for *judicial* dissolution of AJAL and C-Gas under section 57D-6-02(2). But the Cherrys made clear their continued opposition to Armistead's declaratory-judgment counterclaim, which is in effect a claim for *contractual* dissolution of C-Gas. Because there could be no basis for judicial dissolution of C-Gas if it has been or must be dissolved under its operating agreement, both sides agreed that the Court must first resolve their dispute about the declaratory-judgment claim. Hence, that is where the Court begins.

33. **C-Gas.** The deadlock provision in C-Gas's operating agreement is straightforward. If Jay and Armistead are "unable to agree to any item under Section 9.2, or any other provision . . . requiring mutual, total, or majority consent," it is considered "a 'Deadlock.'" In that event, either may choose "to sell or purchase all other Company Interests pursuant to Section 11.2." But if neither Jay nor Armistead

"follow[s] the provisions of Section 11.2 within ten . . . days from the event causing the Deadlock, the Company shall be dissolved." Among the items listed in Section 9.2 are "[m]aking capital expenditures" and "[m]aking cash distributions." (C-Gas Op. Agrmt. §§ 9.2(f), 9.2(g), 9.3.)

34. Armistead points to his December 2024 member meeting with Jay. At that meeting, the two men did not agree on proposals to reimburse Cherry Oil for certain expenses or to make monthly cash distributions from C-Gas's accounts. According to Armistead, these disagreements triggered the ten-day period for either member to buy the other's interest. Because neither did so, Armistead contends, the operating agreement requires C-Gas's dissolution.

35. In response, the Cherrys argue that Armistead has manufactured a dispute to cause C-Gas's dissolution. To allow that, in their view, would violate section 12.1 of the agreement and the implied covenant of good faith and fair dealing. On that basis, the Cherrys contend that no event has triggered the deadlock provision. Assuming the deadlock provision was triggered, they contend that Armistead waived his right to enforce it.

36. The Court agrees with Armistead. In their December 2024 meeting, Jay and Armistead were unable to agree as to two items listed in section 9.2 of the operating agreement: reimbursements to Cherry Oil and future cash distributions. There's no dispute about that. And the deadlock provision could not be clearer about what must occur when the members cannot agree on items listed in section 9.2. Either one member must start the process to buy out the other within ten days, or the company

*shall* be dissolved. The plain language of the agreement leaves no wiggle room. Because neither member chose to buy out the other, dissolution is mandatory, and Armistead is entitled to the declaration that he seeks. *See Internet East, Inc. v. Duro Communs., Inc.*, 146 N.C. App. 401, 405–06 (2001) (noting that the word "shall" is used "to express what is mandatory" (citation and quotation marks omitted)).

37. The Cherrys' interpretive arguments are unpersuasive. Section 12.1 merely states that "[n]o individual Member shall have the right to cause a dissolution of the Company." (C-Gas Op. Agrmt. § 12.1.) By its very nature, the dissolution mandated by the deadlock provision involves both members—first, in disputing a matter under section 9.2 and, second, in failing to invoke the buy-out procedure within the time allotted. Thus, section 12.1's prohibition on unilateral dissolution is beside the point. Likewise, the operating agreement's implied covenant of good faith and fair dealing cannot vary or contradict its express terms. *See, e.g.*, *Chesson v. Rives*, 2016 NCBC LEXIS 92, at *37 (N.C. Super. Ct. Nov. 30, 2016) ("Plaintiffs seek to use the implied covenant to vary the terms of an express provision in the Partnership Agreement. The Court rejects that effort as improper."); *Pro-Tech Energy Solutions, LLC v. Cooper*, 2015 NCBC LEXIS 76, at *21 (N.C. Super. Ct. July 30, 2015) (collecting cases).

38. The Cherrys' waiver argument is equally unpersuasive. A "waiver is an intentional relinquishment or abandonment of a known right or privilege." *Mt. Airy-Surry Cnty. Airport Auth. v. Angel*, 267 N.C. App. 548, 552 (2019) (citation and quotation marks omitted). The Cherrys contend that disputes about distributions

arose as early as July 2024 and that Armistead sat on his rights, thus waiving them. Not so. At the outset of this lawsuit, Armistead took the position that he and Jay had agreed to the amount and timing of distributions a decade prior, which gave him the authority to continue making distributions. It cannot be the case that Armistead knowingly abandoned his right to enforce the deadlock provision when he denied that a deadlock had occurred. The situation changed when the Court preliminarily enjoined Armistead from making additional distributions without Jay's consent. At that point, Armistead pursued his claim for declaratory relief. There was no waiver.

39. Moreover, Armistead does not rely only on the disagreement about distributions. He points to a second dispute over Jay's proposal to reimburse Cherry Oil. It is undisputed that the proposed reimbursement requires majority approval, that Jay and Armistead were unable to agree at the December 2024 meeting, and that neither elected to buy out the other within ten days of that disagreement. The Cherrys do not respond to this argument in any way, much less suggest that Armistead knowingly waived his right to enforce the deadlock provision on this ground.

40. Although the Cherrys complain that enforcing the deadlock provision will produce an absurd result, they are wrong. A concern with any closely held company—especially one with only two members—is that prolonged managerial deadlock may stifle its operations and lead to waste, absent some way to break the tie. Here, the members adopted an agreement that requires consensus as to capital expenditures and distributions while also providing a fast-acting mechanism to overcome any

deadlock. Their bargain—to carry on when consensus exists; to require a buyout or dissolution when consensus breaks down—is neither arbitrary nor absurd. And having struck that bargain, the parties must adhere to it. *See* N.C.G.S. § 57D-10-01(c) ("It is the policy of this Chapter to give the maximum effect to the principle of freedom of contract and the enforceability of operating agreements."); *see also Mauck*, 2025 N.C. LEXIS 861, at *18 (stressing, in the corporate context, the value of upholding a dispute-resolution "mechanism the parties themselves created").

41. The Court therefore grants Armistead's motion for summary judgment as to his declaratory-judgment claim and denies as moot his motion for summary judgment as to his claim for judicial dissolution of C-Gas. *See* N.C.G.S. § 57D-6-01(1) (stating that an LLC is dissolved upon "[a]n event causing the LLC to dissolve under the operating agreement").

42. **AJAL.** Unlike C-Gas's operating agreement, AJAL's has no deadlock provision. Armistead therefore seeks only judicial dissolution of AJAL under section 57D-6-02(2).

43. A member of an LLC may seek judicial dissolution either when "it is not practicable to conduct the LLC's business in conformance with the operating agreement and" governing statutes, N.C.G.S. § 57D-6-02(2)(i), or when "liquidation of the LLC is necessary to protect the rights and interests of the member," *id.* § 57D-6-02(2)(ii). Notably, if the trial court determines that dissolution is appropriate under subsection (ii), "the court will not order dissolution if after the court's decision the LLC or one or more other members elect to purchase the ownership interest of

the complaining member at its fair value in accordance with any procedures the court may provide." *Id.* § 57D-6-03(d).

44.    In his pleading, Armistead invokes both subsections, alleging not only that "[i]t is not practicable to conduct AJAL business" but also that "[l]iquidation of AJAL is necessary to protect" his rights. (Def's Crosscl. & Countercl. ¶¶ 46–49.) Similarly, in his motion, Armistead seeks summary judgment for dissolution of AJAL "under N.C.G.S. § 57D-6-02(2)," without differentiating between the two subsections. (ECF No. 54.) In his brief, however, Armistead directs his arguments to subsection (i), arguing that the parties' deadlock makes it impracticable to operate AJAL's business. (*See generally* ECF No. 55.)

45.    The Cherrys initially opposed dissolution of AJAL under either subsection. After the summary-judgment hearing, however, they withdrew their opposition to dissolution under subsection (ii) and asserted their intent to buy Armistead's interest at fair value under section 57D-6-03(d).

46.    A rather awkward situation now exists. Rarely does a party oppose the very relief demanded in its pleading (and motion), but that is the case here. Armistead has a live claim for dissolution of AJAL arising under both subsections (i) and (ii) of section 57D-6-02(2). Although the Cherrys consent to the entry of judgment under subsection (ii), Armistead opposes that relief and insists, instead, that judgment must be entered under subsection (i).

47.    Having carefully considered the issue, the Court concludes that judgment is appropriate under subsection (ii), not subsection (i). Put simply, Armistead is bound

by his pleading and motion. He chose to pursue a single, unified claim for dissolution under section 57D-6-02(2), invoking both subsections, and expressly alleged that liquidation of AJAL is necessary to protect his rights. The claim is not contingent, conditional, or stated in the alternative. Nor has Armistead amended, withdrawn, or dismissed his allegations. *See Rollins v. Junior Miller Roofing Co.*, 55 N.C. App. 158, 161–62 (1981) ("A party is bound by his pleadings and, unless withdrawn, amended, or otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader." (citation and quotation marks omitted)). What's more, his motion requests judgment under section 57D-6-02(2), not under one subsection or the other. And now that the Cherrys have acquiesced, there are no issues of material fact for a jury to decide. Summary judgment is therefore appropriate. *See* N.C. R. Civ. P. 56(c) (stating that "[t]he judgment sought shall be rendered forthwith" when "there is no genuine issue as to any material fact").

48. It appears that Armistead opposes entry of judgment on this ground because he would rather not sell his interest to the Cherrys for fair value, as section 57D-6-03(d) allows. Pleader's remorse is not a sound reason to set aside the claim as alleged, and Armistead has not moved to amend either his pleading or his motion to retract the relief requested. His pleading "specifically invokes a statutory provision that may entail, if a member elects, a forced sale of the complaining member's interest at its fair value." *Troutt v. Watson*, 2024 N.C. App. LEXIS 93, at *8 (N.C. Ct. App. Feb. 6, 2024). Armistead is getting exactly what he asked for.

49. The equities also support the Court's decision. As our Supreme Court recently reiterated, a trial court has discretion to exercise its "equitable judgment" not to dissolve a corporation or LLC. *Mauck*, 2025 N.C. LEXIS 861, at *15 ("That discretion reflects both the gravity of the remedy and the equitable principles that shape it."). By all accounts, AJAL is a profitable company with substantial assets, including real property and a long-term lease with Cherry Oil that ensures stable cash flow well into the future. To sell these assets and wind up AJAL's affairs would undoubtedly be disruptive to the company's members as well as its business partners, such as Cherry Oil. Courts rightly hesitate to dissolve a going concern in these circumstances. *See, e.g.*, *Levine v. Beem*, 608 So.2d 373, 375 (Ala. 1992) ("The lease and maintenance of the real property is Malaga Properties' only objective and none of the alleged ill will between Levine and Sinclair has prevented Malaga Properties from accomplishing its objectives.").

50. One other point bears noting. In their supplemental filing, the Cherrys appear to contend that section 57D-6-03(d) gives them the right to buy Louise's interest as well as Armistead's. But Armistead, not Louise, is the "complaining member." N.C.G.S. § 57D-6-03(d). Louise's interest is not at issue. Moreover, she has the same statutory right as the Cherrys to "elect to purchase the ownership interest of" her husband for fair value. *Id.*

51. The Court therefore grants in part Armistead's motion for summary judgment. Armistead is entitled to the entry of judgment on his claim for dissolution under section 57D-6-02(2)(ii). Because the Cherrys have stated their intent to

exercise the remedy offered by section 57D-6-03(d), the Court will not order AJAL's dissolution.

## III.
## CONCLUSION

52.    For all these reasons, the Court **GRANTS** in part and **DENIES** in part the Cherrys' motion for summary judgment:

   a. The Cherrys are entitled to judgment of liability against Armistead as to their claims for breach of contract.  They are also entitled to nominal damages and a permanent injunction, as conceded by Armistead's counsel.

   b. The Court **DENIES** the Cherrys' request for additional monetary relief, whether framed as compensatory damages or specific performance.

53.    The Court **GRANTS** in part and **DENIES** in part Armistead's motion for summary judgment:

   a. Armistead is entitled to a declaratory judgment that C-Gas is dissolved under its operating agreement.

   b. The Court **DENIES** as moot the motion as to the crossclaim for judicial dissolution of C-Gas under section 57D-6-02(2).

   c. Armistead is also entitled to judgment as to his claim for judicial dissolution of AJAL under section 57D-6-02(2)(ii).  The Court will not, however, order AJAL's dissolution, as permitted under section 57D-6-03(d).  The Court **DENIES** the motion to the extent it seeks

summary judgment as to judicial dissolution of AJAL under section 57D-6-02(2)(i).

54.  No claims or issues remain for trial.  Within fourteen days of this order, the parties shall confer and file (jointly, if possible) a statement reflecting their positions on how best to bring this case to a close, including the completion of all necessary steps under section 57D-6-03(d).

**SO ORDERED**, this the 8th day of December, 2025.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases